# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 7, 2022        Decided February 14, 2023

No. 21-1126

SOLAR ENERGY INDUSTRIES ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEWSUN ENERGY LLC AND BROADVIEW SOLAR, LLC,
INTERVENORS

———

Consolidated with 21-1136, 21-1142, 21-1149, 21-1175

———

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

———

*Jeremy C. Marwell* argued the cause for petitioners The Edison Electric Institute and Northwestern Corporation. With him on the briefs were *Sarah N. Norcott* and *James T. Dawson*.

2

*Heather Curlee* argued the cause for petitioner Solar Energy Industry Association. With her on the briefs was *Todd G. Glass*.

*Adam Lowney* and *Christopher Jones* were on the brief for *amicus curiae* Pacificorp d/b/a/ Pacific Power and Rocky Mountain Power in support of petitioners.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen,* General Counsel, and *Robert H. Solomon*, Solicitor. *Anand Viswanathan*, Attorney, entered an appearance.

*Robert M. Loeb* argued the cause for intervenors NewSun Energy LLC and Broadview Solar, LLC. With him on the brief were *Gregory M. Adams*, *Adam Wenner,* and *Jeremy R. Peterman. Peter Richardson* entered an appearance.

*Kip D. Nelson*, *Nick Jimenez*, and *Irion A. Sanger* were on the brief for *amici curiae* Carolinas Clean Energy Business Association, et al. in support of respondent.

Before: PILLARD and WALKER, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

SENTELLE, *Senior Circuit Judge*: The Edison Electric Institute and NorthWestern Corporation, d/b/a NorthWestern Energy, (collectively, "Utilities") petition for review of an

3

order by the Federal Energy Regulatory Commission ("Commission") in which the Commission granted Broadview Solar's application to become a qualifying facility under the Public Utility Regulatory Policies Act of 1978 ("PURPA"). The Solar Energy Industries Association ("SEIA") petitions for review of the Commission's denial of its motion to intervene in the adjudication of Broadview's application.

Because we conclude that the Commission's interpretation of the statute is entitled to deference and that the Commission did not act arbitrarily or capriciously, we deny the Utilities' petitions. We dismiss SEIA's petitions because it lacks Article III standing.

## Background

Section 210 of PURPA was enacted with the goal of promoting the creation and use of alternative energy. *See Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404–05 (1983). It does so, in part, by directing the Commission to prescribe rules affording "qualifying small power production facilities," also commonly known as "qualifying facilities," certain benefits. *See* 16 U.S.C. § 824a-3(a)–(b). To be a qualifying facility under the Act, a facility must use "biomass, waste, renewable resources, geothermal resources, or any combination thereof" to produce energy and have "a power production capacity which, together with any other facilities located at the same site . . . , is not greater than 80 megawatts." *Id.* § 796(17)(A)(i)–(ii). Facilities may self-certify that they meet these requirements, or they may apply for certification from the Commission. *See* 18 C.F.R. § 292.207(a)–(b). One notable benefit to being a qualifying facility is the mandatory purchase obligation. Under it, electric utilities are required to purchase the energy generated by qualifying facilities,

4

providing those facilities with a guaranteed market.  *See* 16 U.S.C. § 824a-3(a)(2); 18 C.F.R. § 292.303(a).

In September 2019, Broadview applied for certification from the Commission that its Montana facility was a qualifying facility.  That facility consists of a 160 MW solar array and a 50 MW battery storage system, both of which produce or store direct current, or DC, power.  Because the nation's electric grid runs on alternating current, or AC, power, solar facilities must also have devices known as inverters to convert DC power into grid-usable AC power.  Broadview's Montana facility has inverters with a total net capacity of 80 MW.

In its application, Broadview noted its intent to interconnect with and sell energy to NorthWestern Energy, as it would be entitled to do under the mandatory purchasing requirement as a qualifying facility.  The Edison Electric Institute, a trade association representing investor-owned electric companies across the United States subject to mandatory purchasing requirements, and NorthWestern Energy filed motions to intervene in the Broadview docket, objecting to certification of Broadview's facility**.**  Both motions were timely filed by the October 2, 2019, deadline.

The Commission denied Broadview's application for certification in a September 2020 Order, determining that Broadview's facility exceeded the statute's maximum "power production capacity" of 80 MW.  *See Broadview Solar, LLC*, 172 FERC ¶ 61,194 (2020), *set aside*, 174 FERC ¶ 61,199 (2021), *reh'g denied and modified*, 175 FERC ¶ 61,228 (2021).  In reaching this conclusion, the Commission determined that the relevant "capacity" was that of the solar array, which was 160 MW of DC power, and not the inverters' "conversion limit" of 80 MW of AC power.  *Id.* at 62,276.  The Commission acknowledged it was departing from its previous approach set

5

out in *Occidental Geothermal, Inc.*, 17 FERC ¶ 61,231 (1981), which focused on the facility's net output, or "send-out," capacity. It determined, however, that the send-out approach was inconsistent with the statute's text. Broadview filed a request for rehearing. After the Commission issued its September 2020 Order, SEIA also filed a motion to intervene, nearly one year after the original deadline.

In March 2021, the Commission issued a new Order granting Broadview qualifying facility status and setting aside its September 2020 Order. *Broadview Solar, LLC*, 174 FERC ¶ 61,199 (2021). After determining that § 796(17)(A) was ambiguous as to the proper measure of a facility's "power production capacity," the Commission determined that its former send-out approach was the best interpretation because it takes into account all of the facility's components working together, not just the maximum capacity of one subcomponent, and focuses on grid-usable AC power. *Broadview Solar, LLC*, 174 FERC ¶ 61,199, at 61,797. Because Broadview's send-out capacity at any single point in time is capped by the inverters' net output capacity of 80 MW of power, the Commission determined that Broadview's facility met the statutory requirements and granted it qualifying facility status. *Id.* at 61,799, 61,801–02. In the same March 2021 Order, the Commission also determined SEIA failed to establish good cause for its untimely motion to intervene and denied that motion. *Id.* at 61,795.

The Utilities and SEIA filed requests for rehearing. The Commission issued its June 2021 Order, reaffirming that Broadview was a qualifying facility and modifying its March 2021 Order to reject the Utilities' arguments that Broadview's facility represented a novel subversion of the statute and that the battery's capacity had to be calculated separately from the

6

capacity of the solar array.  *Broadview Solar, LLC*, 175 FERC ¶ 61,228 (2021).  This appeal followed.

**Analysis**

### A.  PURPA

####     i.     *Chevron* Challenge

The Utilities argue that the Commission exceeded its statutory authority because, in their view, the "power production capacity" of Broadview's facility is the total amount of DC power generated by the solar array and not the grid-usable AC power produced by the inverters working in conjunction with the solar array and battery.  The Commission argues that the statute is ambiguous as to the proper measure of a facility's "power production capacity" and that its interpretation, focusing on the amount of AC power being sent out to the grid, is reasonable.  We agree with the Commission.

In interpreting the statute, this Court's analysis is governed by the two-step framework set out in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under step one, the court asks "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  But "if the statute is silent or ambiguous with respect to the specific issue," the court moves to step two and must uphold any agency interpretation that is "reasonable."  *Id.* at 843–44.

The parties' dispute in this case turns on the meanings of "facility" and "power production capacity" in 16 U.S.C. § 796(17)(A).  PURPA does not define these terms.  In plain language, a facility's "power production capacity" is the maximum amount of power that the facility can produce.  But

7

the statute does not state whether the relevant capacity is that of the individual subcomponent generating DC power, *i.e.*, the solar array, or of all the facility's components working together to produce grid-usable AC power, which would include the inverters. Because Congress has not spoken to the issue, we move to step two and must defer to any reasonable agency interpretation.

To determine whether the Commission's interpretation was reasonable, we look to see if it "is based on a permissible construction of the statute in light of its language, structure, and purpose" and consistent with the legislative history. *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 754 F.3d 1031, 1042 (D.C. Cir. 2014) (quoting *Am. Fed'n of Labor v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005)); *see also Bell Atl. Tel. Co. v. FCC*, 131 F.3d 1044, 1048-49 (D.C. Cir. 1997).

We start with the text. On appeal, the Commission raised for the first time the argument that "capacity" has an industry-specific definition meaning the maximum amount of power that can be supplied to the power grid, *i.e.*, for end-user demand. Because this was not a basis for the Commission's decision, we do not consider it here. *See Secs. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 95 (1943). Even so, the Commission's interpretations of "power production capacity" as "the facility's net output to the electric utility," and of "facility" as "all of the putative [qualifying facility's] component parts as they work together as a whole," were eminently reasonable. *See* 175 FERC ¶ 61,228, at 62,316–17 (internal quotation marks and citation omitted). As discussed, the statute is ambiguous on the meanings of "power production capacity" and "facility." The only grid-usable "power" that Broadview produces is AC power, and Broadview's inverters work with the solar array and battery as an integral component in producing that power.

8

The Commission's interpretation was further guided, and is amply supported, by the statute's structure and purpose. Determining qualifying facility status by the facility's net output brings various provisions of PURPA into harmony. One of the main benefits of being a qualifying facility is the mandatory purchasing requirement. But the mandatory purchasing requirement only applies to grid-usable power—meaning AC power. The Commission's interpretation of "power production capacity" similarly focuses on net output of grid-usable AC power. Thus, the measure used to determine whether a facility is eligible for qualifying facility status is the same used to determine benefits available to those qualifying facilities.

The Commission's focus on net output is likewise "consistent with the statutory purpose" of PURPA. *Troy Corp. v. Browner*, 120 F.3d 277, 285 (D.C. Cir. 1997) (citing *Chevron*, 467 U.S. at 843). Title II of PURPA was intended "to encourage the development of . . . small power production facilities" and promote the use of alternative energy sources, such as solar. *Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1045 (D.C. Cir. 2000) (quoting *FERC v. Mississippi*, 456 U.S. 742, 750 (1982)). Excluding facilities from qualifying facility status because their component parts have individual production capacities over 80 MW, even though the overall facility cannot send out more than 80 MW to the grid, would be inconsistent with that goal.

Compared to facilities that rely on other energy sources, solar facilities are relatively inefficient at generating power. A solar array needs sunlight; cloud cover and nighttime hinder its production capabilities. Broadview addressed this by installing a solar array with a capacity of 160 MW and a battery, enabling it to produce extra power to be stored in the battery while

9

conditions are optimal and then release that power to the grid when conditions prevent the array from producing enough power to meet the inverters' 80 MW limit. The Utilities complain that this allows Broadview to circumvent the statutory restrictions on qualifying facilities. But viewed in light of the statute's purpose, this arrangement is a feature, not a bug: Broadview is able to more consistently produce, send out, and sell the maximum amount of renewable energy permitted under the statute.

The Commission's interpretation is also consistent with the legislative history. *See City of Cleveland v. U.S. Nuclear Reg. Comm'n*, 68 F.3d 1361, 1367–68 (D.C. Cir. 1995). The Utilities rely on one sentence from a House Committee Report stating that "[t]he power production capacity of the facility means the rated capacity of the facility." H.R. Rep. No. 95-1750, at 89 (1978) (Conf. Rep.). While neither the legislative history nor PURPA defines "rated capacity," it is most frequently used to refer to the performance anticipated under "standard operating conditions." *Occidental*, 17 FERC ¶ 61,231, at 61,444–45. The Utilities adopt this definition in their briefing but fail to apply that definition to the House Committee's full quote, which referred to the "rated capacity *of the facility*." H.R. Rep. No. 95-1750, at 89 (1978) (Conf. Rep.) (emphasis added). Broadview's facility consists of a solar array, battery, and inverters that can regularly produce 80 MW of grid-usable power. As the Commission previously recognized, "a facility's power production capacity is not necessarily determined by the nominal rating of even a key component of the facility. . . . [I]t is not uncommon for smaller facilities to find it most economic to employ commercially available components[,] some of which have individual capabilities significantly exceeding the overall facility capabilities." *Occidental*, 17 FERC ¶ 61,231, at 61,445.

10

The Commission's determination that Broadview is a qualifying facility with a "power production capacity . . . not greater than 80 megawatts," 16 U.S.C. § 796(17)(A)(ii), because its component parts, working together, produce no more than 80 MW of grid-usable AC power was reasonable and well-supported by the statute's text, structure, purpose, and legislative history.

## ii.       Arbitrary and Capricious Challenges

The Utilities raise several other arguments, none of which compels a different result than their first.  First, the Utilities claim the Commission acted arbitrarily and capriciously by granting Broadview's application and ignoring errors on one of Broadview's form submissions.  The Commission requires that all qualifying facility applicants complete its Form 556.  *See* 18 C.F.R. § 292.207(a)(1), (b)(2).  That form provides a formula for calculating the facility's maximum net power production capacity, starting with the "maximum gross power production capacity at the terminals of the individual generator(s)" and subtracting out certain enumerated figures, including electrical losses and power used to run the facility's equipment.  FERC Form No. 556.  When asked for the "maximum gross power production capacity at the terminals of the individual generator(s)," Broadview, in one submission, reported a value of approximately 82.5 MW, while the Utilities claim the correct value was 160 MW.  Because of that error, the Utilities claim the Commission could not grant Broadview's application.

This argument fails because it treats an applicant's completion of Form 556—a tool meant to aid the Commission in its eligibility determination—as itself determinative.  As the Commission explained in its March 2021 Order, "Form No. 556 was always intended to be a flexible tool . . .  to submit

11

information relevant to whether a facility meets the requirements to be considered a [qualifying facility]."  174 FERC ¶ 61,199, at 61,800.  Even assuming the correct input on the form was 160 MW, Broadview explained its facility's novel setup and why its "maximum net power production capacity" was 80 MW.  The Commission's decision to treat Broadview's Form 556 submissions as helpful for determining, but not dispositive of, the facility's eligibility was not arbitrary or capricious.

The Utilities also argue the Commission's decision to treat the solar array and battery as a single facility was arbitrary and capricious. Because the Commission's decision to do so was not inconsistent with the statutory text nor the Commission's own precedent, this argument also fails.

When determining whether a facility is eligible for qualifying facility status, the Commission must look at the combined power production capacity of "facilities located at the same site."  16 U.S.C. § 796(17)(A)(ii); *see also* 18 C.F.R. § 292.204(a)(1)–(2).  As we have discussed, the Commission's interpretation of "facility" to encompass all the components working together to produce grid-usable AC power was reasonable.  But standing on its own, Broadview's battery can store only DC power and cannot deliver any usable power to the grid.  Accordingly, the battery is not a separate "facility" under the Commission's reasonable interpretation of the statutory text.

Citing *Luz Development & Finance Corp.*, 51 FERC ¶ 61,078 (1990), the Utilities argue that Broadview's battery must be considered a separate facility and its capacity aggregated with that of the solar array or inverters.  But *Luz* merely recognized that a battery can be a standalone qualifying facility, *id.* at 61,172; that possibility does not compel the result

12

that it must be a separate facility. The battery in *Luz* was used to store energy purchased from the grid until it was later resold during periods of higher demand, *id.* at 61,168, and is easily distinguishable from Broadview's battery that stores DC power until it can be sent through the inverters and transformed into grid-usable AC power.

Finally, the Utilities challenge the Commission's decision to look at Broadview's instantaneous net power output and not its power output over time. The statute measures "power production capacity" in "megawatts." But power production over time is measured in "megawatt-hours." Rather than being arbitrary and capricious, the Commission's focus on instantaneous power production adhered to the statutory language.

## B. SEIA's Petitions

Turning now to SEIA's petitions for review of the Commission's denial of its motion to intervene, "[o]ur analysis begins and ends with consideration of our jurisdiction." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239 (D.C. Cir. 2015).

For this Court to have jurisdiction, the plaintiff must have standing. "The 'irreducible constitutional minimum of standing contains three elements': (1) the plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be 'likely,' not 'speculative,' that the court can redress the injury." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

13

SEIA fails on the first requirement as it has not suffered an Article III injury-in-fact.  SEIA's claimed injury is that it was "effectively precluded" from defending the net output, or send-out, approach in the Commission's adjudication of Broadview's application. Pet. Br. at 9–10. According to SEIA, any reconsideration of that approach was likely to occur, if at all, during the Commission's contemporaneous rulemaking or the ensuing Ninth Circuit litigation.  Because SEIA failed to anticipate FERC's decision to reconsider the send-out approach in the Broadview adjudication, it also failed to timely intervene in that proceeding and thus could not participate to defend the approach.

At the outset, it should be noted that agencies have "very broad discretion to decide whether to proceed by adjudication or rulemaking." *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013).  The Commission's decision to consider the send-out approach in the Broadview adjudication, rather than through the rulemaking process, was within the bounds of its discretion.  SEIA's claimed injury presupposes that it had a right to participate in any proceedings regarding the send-out approach.  It did not.  "[T]he mere fact that an adjudication creates a precedent that could harm a non-party does not create the injury-in-fact required for Article III standing." *Id.* at 959.

SEIA's failure to timely intervene is the result of its own mistaken judgment.  The effect of that mistake—SEIA's inability to participate in the Commission's proceedings—does not give rise to an Article III injury.  Accordingly, its petitions are dismissed.

14

**CONCLUSION**

For the reasons stated above, we deny the Utilities' petitions and dismiss SEIA's petitions.

WALKER, *Circuit Judge*, concurring in part and dissenting in part:

The Public Utility Regulatory Policies Act gives lucrative benefits to small facilities that produce solar power. It defines them as facilities with a "power production capacity" of no more than 80 megawatts. 16 U.S.C. § 796(17)(A)(ii).

Broadview is a solar-power facility. At its peak, it can produce up to 130 megawatts of useful power. So it is not a "small facility."

Because the Federal Energy Regulatory Commission concluded otherwise, I would grant the petitions for review and vacate FERC's decision.

## I. Background

### A. The Public Utility Regulatory Policies Act

The Public Utility Regulatory Policies Act encourages companies to produce renewable energy. *See* 16 U.S.C. § 824a-3(a); *see generally FERC v. Mississippi*, 456 U.S. 742, 745-46, 750-51 (1982) (describing the Act's history).

To achieve that goal, the Act gives extraordinary benefits to "small power production facilit[ies]." 16 U.S.C. § 796(17)(A). Those facilities produce electricity from "biomass, waste, renewable resources, [or] geothermal resources." *Id.* § 796(17)(A)(i). The Act exempts them from several regulatory burdens. *Id.* § 824a-3(e)(1) (directing FERC to make rules exempting "small power production facilities" from regulation under various statutes). And it guarantees them a viable market by forcing public utilities to buy power that small facilities produce. 16 U.S.C. § 824a-3(a)(2), (b).

2

Requiring public utilities to purchase all the power produced by small facilities is strong medicine.  It can force them to buy power that they do not need or to buy power at an above-market price.  That cost is passed on to consumers.  *Powering America: Reevaluating the Public Utility Regulatory Policies Act's Objectives and its Effects on Today's Consumers: Hearing Before the H. Subcomm. on Energy & Commerce*, 115th Cong. 84 (2017) (testimony of Terry L. Kouba, Vice President, Alliant Energy).

Thus, the Act's definition of "small facility" plays a key role in the statutory scheme: It keeps the mandatory-purchasing regime within bounds.  The broader the definition of "small facility," the greater the number of power plants that get special regulatory treatment under the Act.

The Act defines "small facility" as a "facility" with a "power production capacity" of no more than 80 megawatts.  *Id.* § 796(17)(A)(ii).

**B. Broadview's Design**

Broad Reach Power makes solar and wind energy in California, Montana, Texas, Utah, and Wyoming.  Its complex in Yellowstone County, Montana cost at least $2 billion to build.  In 2019, the Montana Complex could deliver 620 megawatts of power.  That is only slightly less than the amount of power produced by the Hoover Dam in 1939, when it became the world's largest hydroelectric facility.  *The Story of the Hoover Dam*, Bureau of Reclamation (July 13, 2022), https://perma.cc/6JWN-BY77.

In 2019, the Montana Complex contained four separate but similar solar-power projects.  One of them is called Broadview I.

3

Broadview includes a solar array, a battery, and inverters. With 470,000 solar panels, its solar array produces up to 160 megawatts of direct-current power. The battery stores some of those megawatts. And the inverters convert up to 80 megawatts from DC power to alternating-current power. Because the electric grid accepts only AC power, inversion makes the power ready for the grid to receive it.

Depending on the time of day, Broadview's components serve different purposes. During the day, the solar array sends 80 megawatts of power to the inverters and charges the battery. But at night, it can't generate power. That's when the battery matters most. At night, it sends stored power to the inverters and then on to the grid. With the battery, Broadview can deliver more power to the grid than it could without it.

**C. FERC's Decision**

In 2019, Broadview asked FERC to certify it as a "small facility." It argued that its "power production capacity" was not greater than 80 megawatts because its inverters can send only 80 megawatts to the grid at once. 16 U.S.C. § 796(17)(A)(ii).[1]

FERC initially denied Broadview's application, but it reversed course on rehearing. According to FERC, the Public Utility Act's definition of "small facility" is ambiguous

---

[1] Because Broadview is more than one mile apart from the other facilities in the Montana Complex, FERC analyzes it separately under the small-facility rule. 18 C.F.R. § 292.204(a)(1)-(2); *see also* Order re. Broadview Solar III, 2021 WL 3641570 (Aug. 13, 2021) (accepting withdrawal of an application for small-facility status for another plant in Montana Complex).

4

because the statute "neither defines the terms 'facility' and 'power production capacity,' nor explains how the Commission is supposed to ascertain the 'power production capacity' of any particular 'facility.'" JA 200. FERC decided to interpret "power production capacity" to mean the "maximum output that the facility can produce for the electric [grid]." JA 201.

Two intervenors, Northwestern Energy and the Edison Electric Institute, petitioned for this Court's review. If Broadview is a small facility, the Public Utility Act's mandatory-purchasing rule will force Northwestern and some of Edison's members to buy Broadview's power — even if they don't need it.

## II. *Chevron*

The majority opinion captures the central issue: "The parties' dispute in this case turns on the meanings of 'facility' and 'power production capacity' in 16 U.S.C. § 796(17)(A). [The Public Utility Act] does not define these terms. In plain language, a facility's 'power production capacity' is the maximum amount of power that the facility can produce. But the statute does not state whether the relevant capacity is that of the individual subcomponent generating DC power, *i.e.*, the solar array, or of all the facility's components working together to produce grid-usable AC power, which would include the inverters." Majority Op. 6-7.

I agree with that summary. The statute does not expressly state whether "power production capacity" includes "all the facility's components working together." But a lack of express language does not mean that the statute has no answer to the question presented. I would not so quickly conclude, as the Court's next sentence does, that "Congress has not spoken to the issue" and so we "must defer to any reasonable agency

5

interpretation" under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  Majority Op. 7.

That is the path of "*Chevron* maximalism."  *Buffington v. McDonough*, 143 S. Ct. 14, 21 (2022) (Gorsuch, J., concurring in denial of certiorari).  When no express text makes the answer immediately obvious, some maximalists make a beeline to agency deference — before any inquiry into statutory structure, cross-references, context, precedents, dictionaries, or canons of construction.  Then, they use the tools of statutory interpretation not to find the best reading of the text but instead to test whether the agency's interpretation is "reasonable."  *Id.* at 20.

On the D.C. Circuit, *Chevron* maximalism is alive and well. *See, e.g.*, *Loper Bright Enterprises, Inc. v. Raimondo*, 45 F.4th 359, 369 (D.C. Cir. 2022) ("some question" about the meaning of a statute is enough to trigger *Chevron* deference); *American Hospital Association v. Azar*, 967 F.3d 818 (D.C. Cir. 2020) (relying heavily on *Chevron*), *rev'd sub nom American Hospital Association v. Becerra*, 142 S. Ct. 1896, 1906 (2022) (not mentioning *Chevron*).

But the Supreme Court's recent decisions repudiate maximalism.  Indeed, the Court has not deferred to an agency under *Chevron* since 2016.  *See, e.g.*, *Becerra v. Empire Health Foundation*, 142 S. Ct. 2354 (2022) (not mentioning *Chevron*); *National Federation of Independent Business v. OSHA*, 142 S. Ct. 661 (2022) (same); *BNSF Railway Co. v. Loos*, 139 S. Ct. 893 (2019) (same).  Instead, the Court has policed the limits of deference to agencies.  *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

The most important limit is found in *Chevron* itself: "If a court, employing traditional tools of statutory construction,

6

ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.  In other words, courts must try every tool of statutory construction *before* declaring the text ambiguous and proceeding to agency deference.  If they do, they "will almost always reach a conclusion about the best interpretation" of the statute, thus resolving any ambiguity.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2448 (2019) (Kavanaugh, J., concurring); *see also SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9) ("Even under *Chevron*, we owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' we find ourselves unable to discern Congress's meaning.").

True, Congress may leave "a gap for the agency to fill." *Chevron*, 467 U.S. at 843.  "For example, Congress might [direct] an agency to issue rules to prevent companies from dumping 'unreasonable' levels of certain pollutants.  In such a case, what rises to the level of 'unreasonable' is a policy decision." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2152 (2016).  Where an agency uses its expertise to fill such a gap, courts should not second guess the agency's decision.  *Id.*

But today's case is different.  The Public Utility Act does not invite FERC to fill a policy gap.  Instead, as FERC recognizes, the meaning of the statute's technical language "turns on legal principles of the sort that a court usually [applies] — i.e., principles of statutory interpretation — and not determinations specifically entrusted to an agency's expertise."  FERC Br. 40 n.9 (cleaned up).  And courts should not defer when a statute's meaning can be resolved using normal interpretive tools.  "The judiciary is the final authority on issues of statutory construction."  *Chevron*, 467 U.S. at 843 n.9.

7

So here there is every reason to resist the temptation "habitua[lly] to defer to the interpretive views of [the] agenc[y]." *Valent v. Commissioner of Social Security*, 918 F.3d 516, 525 (6th Cir. 2019) (Kethledge, J., dissenting). Instead, we can decide this case by applying, in FERC's words, the "legal principles of the sort that a court usually [applies] — i.e., principles of statutory interpretation." FERC Br. 40 n.9 (cleaned up). That approach follows the Supreme Court's recent *Chevron* caselaw and avoids further entrenching a vertical split between how the Supreme Court and lower courts apply *Chevron*.[2]

### III. Broadview Is Not a "Small Facility"

Applying the normal tools of statutory interpretation, Broadview is not a "small facility" under the Public Utility Act because its "power production capacity" is greater than 80 megawatts.

### A. "Facility"

Start with the term "facility." 16 U.S.C. § 796(17)(A). A facility is "something . . . that is built, installed, or established to serve a particular purpose." Facility (def. 4b), *Merriam-*

---

[2] Though the Supreme Court has given up on *Chevron* maximalism (and perhaps on *Chevron* altogether), lower courts have not. Between 2003 and 2013, lower courts applied *Chevron* in 74.8% of statutory interpretation cases involving agencies and reached step two 65.7% of the time. Kent H. Barnett & Christopher J. Walker, Chevron *in the Circuit Courts*, 116 Mich. L. Rev. 1, 29, 33 (2017). That trend has continued since then. In 2020 and 2021, circuit courts applied *Chevron* 84.5% of the time and reached step two in 59.2% of those cases. *See* Brief of the Cato Institute and Liberty Justice Center as Amicus Curiae in Support of Petitioners at 21, *Loper Bright v. Raimondo*, No. 22-451 (2022) (supporting petition for certiorari).

8

*Webster* (2023). The statute's focus on a "facility" suggests that we should assess the production capacity of a power plant *as a whole*, not the capacity of an individual component.

That rules out a few possibilities.

First, it tells us that we should not look only at the capacity of Broadview's 160-megawatt solar array. That approach would ignore the facility's other components — for instance, the inverters that limit the array's output to the grid.

Second, it tells us that we should not exclude the power used to charge the facility's battery. The battery is part of the facility. So refusing to count power that the solar array sends to the battery fails to give full meaning to the word "facility."

FERC says we shouldn't count power sent to the battery because it is "not useful to anybody." *See* Oral Arg. Tr. 31. But a battery like Broadview's lets a solar facility send power to the grid at times when it otherwise could not. By allowing the facility to deliver power at night, the battery "increase[s] [Broadview's] ability to provide reliable and/or timely service to . . . customers." JA 54 (Pasley Affidavit).

The battery also makes Broadview more efficient. A solar-power facility without a battery sends to the grid "approximately 25 to 30 percent" of the maximum power its array could theoretically generate each day. *Id.* With the battery, Broadview sends "approximately 35 to 40 percent," *id.*, because it is "capable of sustaining its maximum output for additional hours in the day," JA 23. That increased efficiency makes the facility more profitable. *See* Christopher Cerny, *A Broad View of Broadview Solar: How FERC's Whiplash-Inducing Orders Expand the Scope of PURPA*, 23 Minn. J.L. Sci. & Tech. 363, 406 (2022).

9

In short, the battery *is* useful.  It lets Broadview make more money by prolonging its maximum output.

## B. "Power Production Capacity"

Turn next to the phrase "power production capacity."

### 1. "Power"

Power means "a source or means of supplying energy, especially[ ] electricity."  Power (def. 6), *Merriam-Webster* (2023).  "Power" includes both DC power and AC power.  *See Chemehuevi Tribe of Indians v. Federal Power Commission*, 489 F.2d 1207, 1217 (D.C. Cir. 1973) (discussing history of power transmission).  So both the DC power used to charge the battery and the AC power sent directly to the grid count as "power."

Yet FERC claims that only the 80 megawatts of AC power sent to the grid should count as Broadview's power-production capacity.  That adds an atextual limit that Congress didn't adopt.  The Public Utility Act says "power production capacity," not "AC power production capacity."  And Congress is perfectly capable of saying "AC" when it wants to.  *See, e.g.*, 26 U.S.C. § 48E(a)(2)(A)(ii) (defining a "qualified facility" as one "with a maximum net output of less than 1 megawatt (*as measured in alternating current*))" (emphasis added).

### 2. "Production"

After "power" comes "production."  To "produce" something is to "create" it, or to "cause [it] to accrue."  Produce (defs. 6 & 7), *Merriam-Webster* (2023).  Another apt synonym is to "generate."  *See Facebook, Inc. v. Duguid*, 141 S. Ct.

10

1163, 1171-72 (2021) (noting the "close[ ] connect[ion]" between the verb "produce" and the noun "generator").

Power sent to a battery like Broadview's is created and does accrue. Before the sun's rays hit Broadview's array, the battery is empty. It is charged when the facility converts solar energy into useful power. If Broadview did not "produce" the power used to charge the battery, what did?[3]

Consider what happens when the battery charges. Broadview uses a lithium-ion battery. Charging that battery prompts a chemical reaction, causing lithium ions to move within the battery. *How Does a Lithium-Ion Battery Work?*, Energy.gov (Sept. 14, 2017), https://perma.cc/CUA8-Y9UK (during charging "[l]ithium ions are released by the cathode and received by the anode"). Without power, that chemical reaction could not happen. So Broadview must "produce" the power used to charge the battery.

### 3. "Capacity"

In the statute's context, "capacity" means "the maximum amount of power that the facility can produce." Majority Op. 6-7; *see also* Capacity (def. 5), *Merriam-Webster* (2023) (defining "capacity" as "maximum output").

But here, FERC rewrites the statute. It says "capacity" includes only the power that a facility supplies to the electric grid.

---

[3] Some power at facilities like Broadview is lost to inefficiencies during production. FERC allows power plants to deduct those "electrical losses" from their power production capacity. *See* JA 210. So if Broadview had a 160-megawatt array, 80-megawatt inverters, and no battery, it would count as a "small facility" — albeit an inefficient one that loses half of its potential output during production.

11

Yet that changes "power production capacity" to "power delivery capacity."  And the word "production" means something different from "delivery."  *See* Deliver (def. 5), *Merriam-Webster* (2023) ("[T]o send . . . to an intended target or destination.").[4]

To its credit, FERC conceded at oral argument that "power production capacity" would likely include power never delivered to the grid if it is used "on site" for a "useful" purpose like powering an on-site factory.  Oral Arg. Tr. 30.  But that concession just highlights the problem with FERC's approach: Charging a battery like Broadview's *is* a useful purpose.

## C. Broadview's "Power Production Capacity"

Broadview has the capacity to produce 130 megawatts of power.  It produces 80 megawatts of inverted AC power that is delivered to the grid *while* producing 50 megawatts of not-yet-inverted DC power to charge its battery.[5]  Because "power"

---

[4] FERC conflated "production" and "delivery" in its rehearing order, although its counsel wisely retreated from that approach on appeal. *Compare* JA 201 (FERC: " ' production' and 'delivery' . . . are overlapping"), *with* Oral Arg. Tr. 33 (FERC: "we're not talking about delivery"); *id.* at 37 ("[Y]ou're not depending on a conflation of the words production and delivery — right?  [FERC:] Correct.").

[5] The record is unclear on the amount of power the battery can receive from the array.  But the parties agree that the battery can take in up to 50 megawatts.  *Compare* Edison Br. 10 n.3 ("The Broadview Project's battery can be charged at the same rate as it discharges — i.e., it can receive and send out 50 megawatts of energy each hour."), *with* FERC Br. 14 ("[U]p to 50 megawatts of power is diverted to battery storage for later release.").

12

includes AC and DC power, Broadview's power production ca-
pacity is the sum of the two:

$$80 + 50 = 130$$

Consider an analogy.  Every weekday, a lumberjack cuts
down two trees and chops them into sellable timber.  But he
has a small truck and can take only one tree's worth of timber
to market daily.  What is the lumberjack's daily timber "pro-
duction capacity"?  Two trees.  Every day he works, he can turn
two trees into sellable timber.  (Maybe he delivers some of the
other trees on the weekends.)

Broadview is similar.  When the sun is out, Broadview pro-
duces 80 megawatts of power for the inverters and 50 mega-
watts of power for the battery — the equivalent of the lumber-
jack's two trees.  Like the lumberjack's second tree, the 50
megawatts of power sent to the battery is still produced even
though it isn't immediately delivered to the market for use on
the grid.  The key is that the 50 megawatts produced by the
solar array and sent first to the battery is not wasted by the fa-
cility.  Those 50 megawatts end up on the grid — just like the
80 megawatts sent from the solar array directly to the inverters.

That gives Broadview a power production capacity of 130
megawatts.  And because the power production capacity of a
"small facility" cannot exceed 80 megawatts, Broadview is not
a "small facility."  16 U.S.C. § 796(17)(A).

13

**IV. Conclusion**

The following three facts are uncontested:

1.  When the Public Utility Act says "power," it does not specify between AC power and DC power.

2.  Broadview can send 80 megawatts of AC power directly to the grid for sale via the inverters.

3.  At the exact same moment, up to 50 megawatts of DC power goes straight to the battery, then later to the inverters, and then on to the grid for sale.

Because Broadview can produce 80 megawatts for its inverters while it simultaneously produces 50 megawatts for its battery, Broadview's facility is capable of producing more than 80 megawatts of power. So it is too large to be a "small facility."

For that reason, I would grant the petitions, vacate the rehearing orders, and remand to FERC for reconsideration.[6]

---

[6] I agree with the majority that Solar Energy lacks standing to challenge FERC's denial of its motion to intervene.